DAVID N. HURD, United States District Judge
I. INTRODUCTION
Acting on information from another drug investigation, an alphabet soup of state and federal law enforcement agencies spent the better part of the 2017 calendar year exploring whether defendant Abner Peralta ("Peralta" or "defendant") might be an additional conduit through which cocaine flowed into the Utica area.
In October of that year, Drug Enforcement Agency ("DEA") Special Agent Ryan Phelan ("Agent Phelan") swore out an affidavit detailing how this joint state-federal task force had used physical and electronic surveillance to catalogue Peralta's movements and scrutinize his associates' behavior. Backed up with controlled buys from confidential sources, Agent Phelan described how he and his fellow agents unearthed an incriminating pattern of activity in which defendant played a central role.
The strength of Agent Phelan's thirty-seven page affidavit convinced U.S. Magistrate Judge David E. Peebles to issue a warrant authorizing a search of Peralta's home, his vehicle, and another property frequented by him. When agents executed the warrant, they discovered evidence consistent with drug trafficking activity.
*316 Thereafter, a federal grand jury indicted defendant as a co-conspirator in a cocaine distribution ring, and with possession of cocaine base and of a firearm in furtherance of that criminal enterprise.
Peralta contends the evidence against him must be suppressed because Agent Phelan's affidavit contains material inaccuracies and omissions that were either knowingly false or made with reckless disregard for the truth. The United States of America (the "Government") opposes the motion, which has been fully briefed. Oral argument was heard on December 20, 2018 in Utica, New York.[1] Decision was reserved.
II. BACKGROUND [2]
In December of 2015, the DEA opened an investigation into a cocaine trafficking organization run out of the Utica area by a man named Julian Lucia-Cedano, better known by the alias "Gilbert Rosa Sanchez." Aff. ¶ 15. Over the next six months, federal agents wiretapped cell phones used by the Rosa-Sanchez organization and, by October of 2016, state and federal agents managed to arrest and charge ten of its members. Id. After several of these defendants agreed to exchange information for more favorable treatment, they identified Peralta as the head of another cocaine trafficking ring operating in the Utica area. See id. ¶¶ 15-16 & n.2.
In January of 2017, law enforcement used this new information to open an investigation into Peralta. Aff. ¶¶ 17-18. Agents soon learned that defendant lives at 314 Richardson Avenue in Utica, a two-story multi-dwelling house with a detached garage in the back. Id. ¶¶ 9, 18-20. Surveillance at that address established that defendant owns a 2012 white Mercedes-Benz SUV and a 2016 white Honda Accord bearing New York license plate HCX-7741. Id. ¶ 21.
On May 30, 2017, at about 9:08 p.m., agents watched Peralta leave his house, get into the Mercedes-Benz SUV parked in the driveway, and drive to an address on Thomas Street in Utica to meet a man referred to by agents as "Individual 2." Aff. ¶¶ 9, 23-24. Agents observed defendant leave a few minutes later. Id. ¶ 24. According to Agent Phelan's affidavit, this is an instance in which defendant delivered a quantity of cocaine to Individual 2. Id.
This conclusion is based, at least in part, on the fact that other cocaine sales executed by other parties are connected to Individual 2 and the Thomas Street location. Aff. ¶ 24. For instance, in June of 2017 agents used a confidential source ("CS # 2") to make two controlled purchases of cocaine from "Individual 1," another suspect in the ongoing investigation. Id. On both occasions, Individual 1 entered the Thomas Street building just before making each drug sale. Id. ¶¶ 38-42 (detailing a June 9 sale); id. ¶¶ 43-44 (detailing a June 30 sale).
The affidavit also alleged Peralta has delivered cocaine to Luis Colon ("Colon"), a co-defendant charged in the indictment in this case. Aff. ¶¶ 28-29. Among other things, the affidavit explained that agents had previously intercepted evidence that Colon obtained cocaine from members of the Rosa-Sanchez organization. Id. ¶ 28. Just as with the two Thomas Street sales connected to Individual 1, the affidavit established *317 defendant's alleged criminal relationship with Colon through a series of intermediate steps. See id. ¶¶ 25, 28-29.
First, on June 9, 2017, at about 2:30 p.m., Agent Phelan followed Colon as he left the Black Cat Bar & Grill, took a call on his cell phone, and then drove to Peralta's house. Aff. ¶¶ 25-26. From there, Colon waited about four minutes until defendant showed up in his white Honda Accord. Id. ¶ 27.
Agent Phelan then watched as Peralta got out of his own car, walked toward the detached garage located in the back of the house, returned a few minutes later, and "walked toward the passenger side door" of Colon's car. Aff. ¶ 27. After about two minutes, defendant walked away from Colon's car and Colon drove away. Id.
Second, later that week agents used another confidential source ("CS # 1") to make a controlled buy of cocaine from Colon. Aff. ¶ 29. On that occasion, agents followed Colon to Peralta's house and, "immediately" after Colon left the residence, Colon returned to his own house and sold the cocaine to CS # 1. Id.
That same week, on July 12 and 13, agents watched Peralta pull into the driveway of the Thomas Street address in his white Honda Accord, stay for a few minutes, and then leave. Aff. ¶¶ 30-32, 46-47. The affidavit alleged these were two examples of defendant delivering drugs to Colon and Individual 2, who in turn sold the product to other end users. Id.
On August 18, 2017, at about 2:54 p.m., agents covering Peralta's house watched him greet and shake hands with a co-worker of Employee 1, an employee at "Carbone Auto Group" known to law enforcement as a person who "frequently sen[t] other employees of [Carbone] to pick up cocaine" from Rosa-Sanchez group members. Aff. ¶¶ 33-35.
On September 12, 2017, at about 10:50 a.m., real-time tracking data indicated that Peralta's white Honda Accord was near 1316/1318 Catherine Street, a three-story multi-dwelling residence in Utica.[3] Aff. ¶¶ 9, 54. At about 11:00 a.m., agents saw defendant's car parked in the Catherine Street building's driveway with its trunk open. Id. ¶ 54. At that time, an unknown white male was standing next to the car "holding a book bag around his shoulder." Id.
On September 15, 2017, at about 12:05 p.m. the tracking data indicated Peralta's white Honda Accord had returned to the Catherine Street building. Aff. ¶ 56. Three minutes later, the vehicle drove straight to the Thomas Street address, where agents picked up visual surveillance. Id. The white Honda Accord drove away a few minutes later. Id. Agent Phelan alleged defendant delivered cocaine to Individual 2 at the Thomas Street address at this time. Id. Later that afternoon, around 3:16 p.m., agents watched defendant exit the side door of the Catherine Street building carrying a dark backpack, which he placed in the back seat of the car. Id. ¶ 57.
During the week of September 15, 2017, agents set up a larger cocaine purchase from Individual 1 using CS # 2. Aff. ¶ 48. Before the deal went down, CS # 2 told the agents that Individual 1 advised him to make contact using a new telephone number. Id. At around 10:22 a.m., a woman believed to be an associate of Individual 1 *318 called CS # 2 from this new phone number and told him she could not meet up to make a sale until around noon. Id. ¶ 49. Eventually, CS # 2 received a follow-up phone call from the woman around 11:48 a.m., who instructed CS # 2 to meet her James and Clementian Streets in Utica. Id.
At about 12:10 p.m., a black female exited the passenger side door of a brown Honda Accord parked in the driveway of the Thomas Street building.[4] Aff. ¶ 50. A few minutes later, CS # 2 showed up at the designated location. Id. ¶ 51.
The black female approached CS # 2's car on foot, walked to the passenger side door, and "conducted a narcotics transaction." Aff. ¶ 51. Agent Phelan alleged that the female bought the drugs from Individual 2 (since she had just exited his vehicle) and then immediately re-sold them to CS # 2. Id.
On September 22, 2017, at about 4:54 p.m., agents parked outside the Catherine Street building saw Peralta and another man exit the side door and walk toward Peralta's white Honda Accord. Aff. ¶ 58. According to the agents, defendant carried a black bag with him into the vehicle. Id. The agents followed defendant back to his house, where he exited the vehicle carrying the black bag toward the garage in back. Id.
Shortly thereafter, at about 5:33 p.m., Agent Phelan watched Employee 1 pull up in front of defendant's house in a gray Honda Accord, exit the car, and walk around the back toward the detached garage. Aff. ¶¶ 36, 59. At about 5:42 p.m., the pair "appeared in front" of the house, spent some time talking, and then Employee 1 walked toward his car and drove away. Id. ¶ 59.
Agent Phelan alleged that on this occasion Peralta moved a quantity of drugs from his stash house in the Catherine Street building using the black bag and then brought them to his home, where he in turn sold them to Employee 1. Aff. ¶ 60. Agent Phelan further alleged that telephone records analysis "suggests" that Employee 1 and defendant communicate "frequently." Id.
On October 4, 2017, based on these and other allegations in Agent Phelan's amended affidavit, Judge Peebles signed a search warrant that authorized, among other things, the search of (1) Peralta's house and its detached garage; (2) the Catherine Street building; and (3) the white Honda Accord. When agents executed the searches just over a week later, they recovered several firearms as well as some cocaine, packaging materials, and other related paraphernalia.
III. DISCUSSION
Peralta's suppression motion is premised on Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a case in which the Supreme Court held that the Fourth Amendment entitles a defendant to a hearing if he or she can make a "substantial preliminary showing" that one or more statements necessary to the magistrate's probable cause finding were either knowingly false or made with reckless disregard for the truth.
Peralta contends he is entitled to suppression, or at the very least a Franks hearing, because Agent Phelan deliberately omitted or mischaracterized important contextual information. For instance, the affidavit alleged that agents observed defendant conduct "hand-to-hand transactions *319 with known cocaine customers" employed by Carbone Auto, but failed to disclose that defendant performed auto body work out of his detached garage, where he would occasionally meet with Carbone employees to pick up or drop off vehicles.
Peralta also takes issue with Agent Phelan's description of his involvement with his co-defendant, Colon. Although the affidavit points toward Colon's sale of drugs to CS # 1 as being easily traceable back to him, defendant argues that Agent Phelan glossed over a crucial piece of the puzzle: Colon spent much of the day in question driving other places, visiting other people, and even making other drug sales before ever meeting up with defendant.[5]
Peralta also faults Agent Phelan's description of the "controlled buys" with CS # 2. In particular, defendant argues the affidavit fails to assure the reviewing authority that these buys were completed using the appropriate practices, such as searching the informant before the drug transaction (to ensure the drugs later recovered were not already on their person) and maintaining constant surveillance throughout the process (to ensure the drugs were not sourced from elsewhere).
Finally, Peralta complains that Agent Phelan omitted certain exculpatory information about the Catherine Street building, which defendant's company had purchased to use as a rental property. According to defendant, he and others were actively renovating it and therefore Agent Phelan's statements about the building "being vacant," or "observing unknown people carrying black backpacks" in and out of it, are misleading.
The Government responds that these innocent explanations for some of Peralta's activity, such as his assertion that he performed auto body work out of his detached garage or that he purchased the vacant Catherine Street building to renovate it, were not known to Agent Phelan at the time and would be insufficient to negate probable cause anyway.
The Government recounts how the timing and frequency of Peralta's interactions with drug customers known from the Rosa-Sanchez investigation supply important context in which to view the other allegations made in the affidavit. In particular, the Government explains how agents worked backward to trace the movement of drugs between the Catherine Street building and the garage at defendant's home, where they were later passed off to Colon, to Employee 1, or sometimes delivered to the Thomas Street location.
Peralta replies by insisting the affidavit's information about Thomas Street is a red herring, since none of the drug buys connected to that location involved him. According to defendant, the affidavit does nothing more than show that defendant visited that location a few times over the course of the year. And even that, according to defendant, is suspect, since the affidavit alleges only that "a car believed to be Peralta's" was present there. By that time, agents obviously knew defendant's license plate. So why the circumlocution?
The constitutional backdrop to this dispute is the Fourth Amendment and in *320 particular the Warrants Clause, which commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV ; United States v. Cioffi, 668 F.Supp.2d 385, 390 (E.D.N.Y. 2009) ("The clause was intended as a bulwark against the 'general warrant' abhorred by the colonists and protects against a general, exploratory rummaging in a person's belongings.").
"In determining whether probable cause to issue a search warrant exists, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Serrano, 937 F.Supp.2d 366, 372 (E.D.N.Y. 2013) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ).
In other words, "[t]he quantum of proof necessary to establish probable cause is only a probability, and not a prima facie showing, of criminal activity[.]" Serrano, 937 F.Supp.2d at 372 (citation and internal quotation marks omitted). Accordingly, "[a]n affidavit in support of an application for a search warrant demonstrates a proper showing of probable cause when it sets forth facts sufficient to enable a reasonably prudent person to believe a search of the areas described within the warrant will uncover evidence of a crime." Id. (citing Berger v. New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) ).
As this language suggests, "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause." United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Consequently, the Supreme Court has repeatedly held that a magistrate's determination that probable cause exists to support the issuance of a search warrant "should be paid great deference by reviewing courts." Gates, 462 U.S. at 236, 103 S.Ct. 2317.
As relevant here, "a search carried out pursuant to a warrant is presumed valid." United States v. Mandell, 752 F.3d 544, 551 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). And an affidavit supporting a search warrant enjoys a presumption of validity, too. Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
The Supreme Court has relied on these and other presumptions to significantly restrict the circumstances under which a defendant can challenge the validity of a search warrant. United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) ; United States v. Rutherford, 71 F.Supp.3d 386, 391 (S.D.N.Y. 2014) ("A grudging or negative attitude by reviewing courts toward warrants[ ] is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant[.]").
However, one permissible way to challenge the validity of a search carried out pursuant to a warrant is to allege that the affidavit supporting the warrant application contains deliberately or recklessly false or misleading information or material omissions. Pursuant to Franks v. Delaware, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable *321 cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155-56, 98 S.Ct. 2674.
Importantly, though, "[h]earings under Franks are not freely granted." United States v. Mandell, 710 F.Supp.2d 368, 372 (S.D.N.Y. 2010). "[C]ourts evaluate motions under Franks to an exacting standard-especially where, as here, a defendant primarily alleges that there are omissions, as opposed to misrepresentations, in the search warrant affidavit." United States v. Lahey, 967 F.Supp.2d 698, 708 (S.D.N.Y. 2013) (collecting cases); cf. United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (Wilkinson, J.) (warning of the potential for "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit").
"To be entitled to a Franks hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions in the search warrant affidavit are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." United States v. Harding, 273 F.Supp.2d 411, 426 (S.D.N.Y. 2003) (citation omitted).
Measured against this demanding standard, Peralta has not established his entitlement to a Franks hearing. Defendant's evidentiary proffer includes an affidavit in which he substantiates his innocent explanations for some of the conduct described in Agent Phelan's warrant application. Peralta Aff., Dkt. No. 27-3. For instance, Peralta explains that he is the owner of A & D Auto, an auto body company he runs out of the detached garage behind his Richardson Avenue home. Id. ¶¶ 2-3. Defendant further explains that he maintains telephone and in-person contact with several Carbone Auto Group employees, including the employee referenced in Agent Phelan's affidavit, because Carbone Auto refers business to his auto shop. Id. ¶¶ 3-6.
Peralta also gives an innocent explanation for his interactions with co-defendant Colon, whom he characterizes as a high school friend. Peralta Aff. ¶¶ 8-9. According to defendant, Colon visited his home on the day described in Agent Phelan's affidavit to patronize defendant's auto shop-Colon sought defendant out to effect some minor repairs to a vehicle he planned to sell. Id. Defendant includes additional evidence, such as the underlying investigative report and a transcription of the audio recorded during the controlled buy, to substantiate his claim that the Colon obtained the cocaine from someone other than defendant. See Dkt. Nos. 27-5, 27-6, 27-7.
Peralta's submissions also substantiate his claim that he and his wife purchased the Catherine Street building intent on repairing it and then renting it out. Peralta Aff. ¶ 10. Defendant explains that he hired workers, including a man named Kenny Vice, to effect repairs to the building. Id. ¶ 11. According to defendant, Mr. Vice kept lunch, a water bottle, and other personal items in the black book bag described in Agent Phelan's affidavit. Id. ¶ 12. And Mr. Vice, for his part, has submitted an affidavit backing up defendant's explanation. Vice Aff., Dkt. No. 27-4, ¶¶ 1-4.
These might be perfectly reasonable explanations. But they do not justify a Franks hearing. "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." Mandell, 710 F.Supp.2d at 373. "Indeed, in many cases it is not only appropriate but desirable for officers to provide the magistrate with a distilled version of the circumstances giving *322 rise to probable cause." Dempsey v. Bucknell Univ., 834 F.3d 457, 471 n.10 (3d Cir. 2016).
The affidavit alleged that some or all of the interactions described by Peralta in his affidavit and other submissions were, in Agent Phelan's expert opinion as a drug investigator, consistent with criminal activity. United States v. Fernandes, 50 F.Supp.3d 398, 405 (W.D.N.Y. 2014) (collecting cases where reviewing judge appropriately gave some weight to agent's expert opinion).
Importantly, these sections of Agent Phelan's affidavit do not simply describe a pattern of unambiguously lawful activity and then resort to the black box of "training and experience" to draw the bare conclusion that something criminal must be afoot. Instead, Agent Phelan invoked his "training and experience" in connection with other, independently verifiable factors known to him that pointed toward the likelihood of criminal behavior.
For instance, Agent Phelan knew that certain individuals with whom Peralta frequently interacted had been caught up in the Rosa-Sanchez cocaine bust. He knew that defendant's interactions with those particular individuals came in a manner often associated with drug transactions. And he knew that many of those same individuals, engaged in that same conduct, had been involved in verified drug transactions in the recent past.
Peralta has offered no reason to conclude that he could not have been simultaneously involved in the lawful activity he describes and the unlawful activity alleged by Agent Phelan. United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause."); United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983) (requiring only "a fair probability that the premises will yield the objects specified in the search warrant").
After all, it is not exactly unheard of for drug dealers in this country to conduct their unlawful enterprise in tandem with other, legitimate business ventures. See, e.g., United States v. Tiem Trinh, 665 F.3d 1, 5 (1st Cir. 2011) (affirming denial of suppression where defendant sold marijuana out of his convenience store); United States v. Whiddon, 146 F. App'x 352, 353 (11th Cir. 2005) (per curiam) (affirming denial of suppression where defendant sold methamphetamine out of his auto mechanic shop); United States v. Woosley, 361 F.3d 924 (6th Cir. 2004) (affirming denial of suppression where defendant sold drugs out of auto repair business).
Besides, even if the additional contextual information urged by Peralta were to have been included in the affidavit, the more "complete" picture he seeks to paint would nevertheless still present more than sufficient information to support a finding of probable cause under the circumstances of this case. Cf. Coderre v. City of Wallingford, 668 F. App'x 399 (2d Cir. 2016) (summary order) (rejecting Franks challenge where a corrected hypothetical warrant affidavit that deleted the "purported misstatements" and included the "challenged omissions" did not alter the probable cause determination).
In sum, Peralta has failed to make a "substantial preliminary showing" that any of the alleged misrepresentations or omissions were made deliberately or recklessly, and he has failed to show that any of the additional information or context would have been material to the probable cause determination.
*323 United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003) ("In order to invoke the Franks doctrine, [the defendant] must show that there were intentional and material misrepresentations or omissions in [the] warrant affidavit." (emphases added) ). Accordingly, defendant's motion to suppress will be denied.
B. Double Jeopardy
In a letter motion he filed after briefing on the suppression motion, Peralta requested dismissal of the indictment on the ground that his prosecution on federal charges violates his constitutional protection against double jeopardy. As the Government explains, defendant was initially charged in state court for the conduct alleged in Agent Phelan's affidavit. The current status of that case is unknown.
"The Double Jeopardy Clause of the Fifth Amendment prohibits more than one prosecution for the 'same offence.' " Puerto Rico v. Sanchez Valle, --- U.S. ----, 136 S.Ct. 1863, 1867, 195 L.Ed.2d 179 (2016). However, "[u]nder the dual sovereignty principle, a defendant may be prosecuted for the same conduct by more than one sovereign without offending the Double Jeopardy Clause because breaking the laws of each constitutes separate offenses." United States v. Burden, 600 F.3d 204, 229 (2d Cir. 2010). As relevant here, "[s]tate and federal governments are separate sovereigns in this analysis." Id.
Peralta does not argue that an exception to this doctrine applies, such as the one contemplated by the Supreme Court in Bartkus v. Illinois, 359 U.S. 121, 123-24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). See Burden, 600 F.3d at 229 (explaining that the Clause might be violated by separate or subsequent state-federal prosecutions "when one prosecuting sovereign can be said to be acting as a tool of the other").
Instead, Peralta points out that the continued vitality of the separate sovereign doctrine is at issue in a case before the Supreme Court this term. See Gamble v. United States, --- U.S. ----, 138 S.Ct. 2707, 201 L.Ed.2d 1095 (2018) (Mem.) (granting cert) (No. 17-646). However, unless and until the Supreme Court changes course on the doctrine, (which is something defendant thinks might happen in Gamble ), his Double Jeopardy Clause argument is "foreclosed by prevailing authority." Burden, 600 F.3d at 229. Accordingly, defendant's motion to dismiss the indictment must be denied.
IV. CONCLUSION
Peralta is not entitled to relief or a hearing under Franks, and his double jeopardy argument is foreclosed by binding precedent.
Therefore, it is
ORDERED that
1. Defendant Abner Peralta's motion to suppress evidence is DENIED; and
2. Defendant Abner Peralta's motion to dismiss the indictment is DENIED.
IT IS SO ORDERED.

Peralta has also filed a letter motion requesting dismissal of the indictment. That motion will be considered infra .

The background recounted here is distilled from the amended affidavit sworn to by Agent Phelan, which the Government included in redacted form as part of its opposition. Dkt. No. 28-2. At the Court's request, the Government also provided an unredacted original for in camera review. Dkt. No. 30. The redactions do not change the relevant analysis.

On September 6, 2017, U.S. Magistrate Judge David E. Peebles authorized a GPS tracker warrant for Peralta's white Honda Accord. Aff. ¶ 10(f). Agent Phelan alleges that a utility records inquiry established defendant as a user of the Catherine Street building. Id. ¶ 52. Because multiple stints of surveillance at this location indicate it is otherwise vacant, the affidavit alleges that Catherine Street is a possible "stash house" or processing location for drugs. Id. ¶¶ 52-53.

Agent Phelan alleged this brown Honda Accord is owned by an associate of Individual 2, who has been seen driving it on several occasions. Aff. ¶ 50. Agent Phelan further alleged that Individual 2 has been in contact with Peralta using a telephone number registered to the associate who owns this vehicle. Id.

Peralta asserts Colon stopped at a "Julian's Barbershop," a location which figured prominently in the prior Rosa-Sanchez investigation. Defendant argues Agent Phelan's failure to disclose this stop in the affidavit must have been intentional, since observing Colon stop at a known hub for drug transactions would significantly undermine any link between Colon's drug sales and defendant as a source of supply. At oral argument, the Government insisted this was a case of mistaken identity because there are multiple barbershops in the area. Defendant disputes this assertion.